IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JERMAINE LEE LESLIE, JR.,          )
                                     )
            Plaintiff,        )
                                     )
v.                              )    Civil Action No. 1:17cv1061 (TSE/JFA)
                                   )
RUDY J. FREDERIQUE,          )
                                     )
            Defendant.    )
_____)

## MEMORANDUM OPINION

Jermaine Lee Leslie, Jr., a Virginia inmate proceeding *pro se*, filed a complaint pursuant

to 42 U.S.C. § 1983 alleging that defendant Rudy J. Frederique, a former Deputy at Henrico

County Regional Jail, used excessive force against him on April 19, 2017. (Docket no. 1).

Plaintiff filed a motion for summary judgment, accompanied by several supporting exhibits.

(Docket no. 51). Defendant, also proceeding *pro se*, filed an opposition to the motion along with

several supporting exhibits. (Docket no. 53). Plaintiff filed a reply. (Docket no. 63). The

parties have consented to a magistrate judge deciding this motion for summary judgment.

(Docket nos. 69–71). For the reasons below, plaintiff's motion for summary judgment will be

denied.

## I. BACKGROUND

Plaintiff and defendant have somewhat differing versions of the April 19, 2017 incident

giving rise to this litigation. Accordingly, the court recounts the parties' versions separately.[1]

---

[1] Plaintiff's version of the facts is limited to those included in his motion for summary judgment. (Docket no. 51) Similarly, defendant's version is limited to those facts included in his opposition. (Docket no. 53). As noted below, further details concerning the incident in question are provided by materials from the Henrico County Sheriff's Office.

1

### A. Plaintiff's Version of Events

Plaintiff was instructed by defendant to pack up his belongings prior to being relocated to segregation following an alleged fight with another inmate. (Docket no. 51 at 3). Plaintiff told defendant that he did not have a trash bag to use to pack up his belongings. (*Id.*). Defendant yelled at plaintiff "in an irate tone" to come and get the trash bag that he had in his hand. (*Id.*). Plaintiff came down the stairs and "grabbed" the trash bag before walking back up the stairs. (*Id.*). As he did so, defendant came up behind him, "twisted" his neck, and began to pepper spray plaintiff in the face. (*Id.* at 3–4). Defendant then "threw" plaintiff to the ground and threatened him, stating "stop resisting or I'm going to break your [expletive] neck." (*Id.* at 4). Plaintiff contends he was not resisting "during the entire encounter." (*Id.*). After defendant pepper-sprayed plaintiff, plaintiff went to the ground and put his hands behind his back. (*Id.*). He was then taken to medical for treatment of the pepper spray in his eyes. (*Id.*). As a result of defendant's actions, plaintiff has experienced "burning eyes," lung congestion, and ongoing anxiety when in the presence of law enforcement and prison guards. (*Id.*).

### B. Defendant's Version of Events

Defendant was conducting security checks when he was told about an incident between plaintiff and another inmate. (Docket no. 53 at 1). Defendant was informed that video footage showed that plaintiff had been involved in an altercation, so plaintiff was to be removed from the tier. (*Id.*). Defendant asked plaintiff to come down the stairs of the tier to collect a trash bag in order to pack up his belongings. (*Id.*). At that time, plaintiff was upstairs in the dayroom with inmates Silva and Jones "hyp[ing]" him up. (*Id.*). Defendant asked plaintiff for the third time to come down the stairs. (*Id.*). Plaintiff did so and was "ready to fight" defendant. (*Id.*). Plaintiff "grabbed" the trash bag and "words [were] exchanged" as the plaintiff went back upstairs. (*Id.*).

2

Another inmate, Mr. Jones, could see that plaintiff was angry, so came down the stairs to step between plaintiff and defendant in an attempt to defuse the situation. (*Id.*). Defendant noted that it seemed as though plaintiff was "staggering" with Mr. Jones up the stairs. (*Id.*). Defendant warned plaintiff that if he did not calm down and come down the stairs, he would be pepper-sprayed. (*Id.*). Plaintiff became "combative" and turned around as if he was coming down "for" defendant. (*Id.*). Defendant felt threatened, removed his pepper spray, and "headed" upstairs before plaintiff had a chance to come down the stairs. (*Id.*). Defendant delivered "a single one second burst of spray to the chin to subdue" plaintiff. (*Id.*). Plaintiff was then placed on the ground and handcuffed. (*Id.*). Both plaintiff and defendant were taken to medical; neither had any injuries and no photographs were taken. (*Id.*).

### C. Henrico County Sheriff's Office Records

Also available to the court is material pertaining to both plaintiff and defendant from Henrico County Sheriff's Office. (*See* Docket no. 43).[2] Many of these records are cited by the parties in their respective briefs, and it appears prudent to provide a detailed account of the institutional response to this incident separately, including its response to grievances and internal incident forms as well as its internal affairs investigation. As shown below, these materials further elucidate the facts surrounding this incident.

#### 1. Incident Detail Reports

Defendant filed an incident detail report against plaintiff on April 19, 2017 for "threatening staff." (Docket no. 51 at 31). Defendant stated that plaintiff had been asked to pack up all his belongings to which plaintiff "refuse[d] and became very combative." (*Id.*).

---

[2] The court provided the documents from the Henrico County Sheriff's Office to plaintiff and defendant on January 27, 2020. (Docket no. 48). The court retained the disc containing the available video footage of the incident. (*Id.*).

Consequently, plaintiff was charged with a "2-2 [violation], Treating to do bodily harm to any person." (*Id.*). On April 26, 2017, a disciplinary hearing record form was completed whereby the charge against plaintiff was dismissed. (*Id.* at 32). Plaintiff was not punished. (*Id.*). Under the "reason for finding" section of the form, the hearing officer simply noted "per Lt. Jarrell." (*Id.*). An inter-office memorandum completed by the Chief Jailor reiterated the disposition of the charge as "dismissed." (*Id.* at 33).

Defendant also filed an incident detail report against plaintiff on April 19, 2017 for "2-1 fighting." (*Id.* at 34). Defendant indicated that, while he was doing a head count, an inmate had approached him to say that two other inmates were fighting. (*Id.*). Defendant called "central" to review the video tapes of the alleged incident and then called Sgt. Morman for assistance. (*Id.*). Upon review of the tape, it was determined that two inmates, which included plaintiff, had been fighting and that both were to be charged with a violation of "2-1 Fighting-Engaging in a physical altercation with one another." (*Id.*). On April 26, 2017, a second disciplinary hearing record form was completed whereby this charge against plaintiff was also "dismissed" with the reason for this finding listed as "per Lt. Jarrell." (*Id.* at 35). Again, an inter-office memorandum from the Chief Jailor confirmed this disposition. (*Id.* at 36).

### 2. Plaintiff's Grievance

Following the incident on April 19, 2017, plaintiff filed an inmate grievance form on April 24, 2017 briefly summarizing the event and seeking to press charges against defendant "for using excessive force and making life risking remarks." (Docket no. 51 at 23). The grievance coordinator forwarded plaintiff's grievance to Lt. Jenkins on the same day. (*Id.*). On April 25, 2017, Lt. Jenkins responded to plaintiff explaining that the matter had been investigated and his complaint deemed "founded." (*Id.* at 24–25). "Appropriate actions ha[d] been taken," the

4

institutional charges against plaintiff were dismissed, and he was to be returned to the RISE

program. (*Id.* at 25). It was also noted that an investigator met with plaintiff on the same day

regarding plaintiff's desire to pursue criminal charges. (*Id.*).

Plaintiff filed an appeal to the response on May 13, 2017. (*Id.* at 22). He explained that

he had not been provided with assistance in filing criminal charges against defendant and that he

had been threatened "to be put back in the hole [sic]' if he did not stop "pushing blue notes to

press charges." (*Id.*). Plaintiff also sought paperwork which "state[ed] that the Commonwealth

said [it could not] press charges because [it] do[es] [not] have enough concrete evidence." (*Id.*).

On May 29, 2017, the Jail Administrator's response indicated that the action taken was

"unfounded" and that Investigator DeLuca had spoken with plaintiff about this matter on several

occasions. (*Id.*).

### 3. Henrico County Sheriff's Office's Internal Affairs Investigation

Both plaintiff and defendant refer to the results of Henrico County Sheriff's Office's

internal investigation in support of their respective positions. In fact, it forms much of the basis

of plaintiff's memorandum in support of his motion for summary judgment and defendant

extensively highlights passages as part of his opposition. Accordingly, an overview of the report

is provided below.

On April 26, 2017, Lt. Jenkins sent a memorandum to Sheriff Michael Wade of the

Office of the Sheriff, County of Henrico, Virginia, detailing the internal affairs investigation she

had conducted following plaintiff's grievance against defendant. (*Id.* at 17–20). At the outset,

Lt. Jenkins noted that defendant had been restricted to the post of central control pending the

outcome of the investigation. (*Id.* at 17). Lt. Jenkins reviewed the incident report as part of her

investigation; she explained that the report had been written by defendant and no email alert was

sent out about it, nor did Major Johnson, have any knowledge that it had occurred. (*Id.*). She

also reviewed the video footage which was operational during the incident and provided the

following overview of what it showed. (*Id.*).[3]

> At 2028 hours inmate Leslie can be seen coming down the bottom of the stairs,
> towards Deputy Frederique, takes the trash bag, communicates with the Deputy
> briefly, more than arms [sic] length away, before the Deputy reaches to his side
> and takes out his O.C. spray. At this time inmate Toyre Jones comes down the
> stairs and steps between inmate Leslie and the Deputy and appears to push inmate
> Leslie away from the Deputy, up the stairs. The Deputy can be seen following the
> two inmates up the stairs with his arm extended towards them (possibly deploying
> O.C.). Inmate Jones can be seen returning back down the stairs first at 2028:24
> hours, backing away from the incident. At 2028:29 Deputy Frederique comes
> down the stairs appearing to be struggling with inmate Leslie, pins the inmate
> against the wall and then pulls him to the floor. At 2028:48 it appears that inmate
> Leslie attempted to stand up and was taken back to the floor by Deputy
> Frederique and handcuffs were placed behind his back.

(*Id.*).

Lt. Jenkins then recounts the interviews conducted by Investigator DeLuca. (*Id.* at 18).

Investigator DeLuca interviewed both plaintiff and inmate Autry regarding the "2-1 Fighting"

charge that proved to be the precursor to the event at issue here. According to Investigator

DeLuca, plaintiff and Mr. Autry reported that plaintiff was "inappropriately pepper sprayed,"

with Mr. Autry adding that plaintiff had been "walking away when it happened." (*Id.*).

Investigator DeLuca had watched the video footage of the alleged fighting incident that

defendant referred to in his incident report but did not observe any punches thrown. (*Id.*).

According to plaintiff and Mr. Autry, they were engaging in horseplay and no one was injured.

(*Id.*). Investigator DeLuca also interviewed the witnesses to the incident; inmates Silva and

Jones. (*Id.*). Both stated that plaintiff had been "mouthing off" at defendant and that Mr. Jones

---

[3] Lt. Jenkins notes that Camera 154, which would have shown a full view of the staircase
where this incident transpired, was not operational during the event. (*Id.* at 17).

had intervened, attempting to defuse the situation. (*Id.*). At that point, both inmates stated that defendant reached around Mr. Jones to pepper spray plaintiff as he was walking away. (*Id.*).

Lt. Jenkins interviewed plaintiff, defendant, and Mr. Jones as part of her investigation. (*Id.* at 18–20). Relaying her conversation with defendant, Lt. Jenkins noted that she had to ask defendant to tell her his version of events twice, slowing down on the second time and providing more detail. (*Id.* at 18). Initially, defendant reported that he told plaintiff four times to pack up his belongings and, it was after this fourth occasion, that plaintiff "came downstairs ready to fight me." (*Id.*). Defendant directed plaintiff to go back upstairs to which plaintiff allegedly responded, "I don't have to listen to you, I can take you." (*Id.*). Defendant then jumped to when plaintiff was on the stairs; he explained that "it seemed like the inmate was going to turn around, so he ran upstairs, [and] a 'shuffle' ensued." (*Id.*). Plaintiff and defendant "held" one another, at which point defendant verbally warned plaintiff he was going to be pepper-sprayed. (*Id.*). Defendant then removed the pepper spray from his belt and "delivered a single one second burst of spray" to plaintiff's chin in an attempt to "subdue . . . calm" him. (*Id.*). Defendant reported that he felt threatened and that plaintiff was "combative," "fighting back, trying to elbow him" once he had restrained plaintiff on the ground. (*Id.*).

On the second recount, defendant stated that once plaintiff was down the stairs he was in defendant's face, "flexing" his arms and fists. (*Id.*). When asked to clarify, defendant first repeated that plaintiff was in his face but then stated he was an "arm's length away." (*Id.*). Plaintiff allegedly told him that he would have to call for back up; defendant felt threatened but could not call for assistance, and did not, because his radio was charging in the building unit manager's office. (*Id.*). Defendant stated that he could not have reached through the door, to which he was near, to retrieve his radio and he felt that he needed to take "immediate" action.

7

(*Id.*). Defendant asked plaintiff to go back upstairs and plaintiff complied, but then plaintiff turned around "coming towards me." (*Id.* at 18–19). However, plaintiff did not have a chance to come down the stairs before defendant "met him on the steps." (*Id.* at 19). Plaintiff was making several verbal statements such as "he's gonna take me" and "he's not built that way," and in response, defendant met him on the stairs and grabbed his arm. (*Id.*). Mr. Jones tried to pull plaintiff up the stairs and told plaintiff to go back upstairs. (*Id.*). However, defendant said plaintiff tried to "come at" him. (*Id.*). Defendant pepper-sprayed plaintiff, put the spray away, pulled plaintiff downstairs, placed him on his stomach, and then cuffed him. (*Id.*). Defendant denied making any statements to plaintiff such as "stop resisting or I will break your neck," but noted that plaintiff was not resisting when on the floor. (*Id.*).

Following the incident, defendant spoke with Sgt. Walker who advised him that "he could have walked away from [plaintiff] and gained distance," but defendant respectively disagreed. (*Id.*). He initially did not agree because he was by the door, he was the only Deputy in the building at the time, and he did not have his radio. (*Id.*). Defendant and Lt. Jenkins reviewed the video of the incident together and, according to Lt. Jenkins, defendant "admitted that it was not the way he had remembered things going." (*Id.*). In this further discussion, defendant acknowledged that plaintiff was three to four steps up the stairway when plaintiff turned his body around toward him, but plaintiff did not move his feet or take any steps down the stairway before defendant approached plaintiff. (*Id.*). Defendant stated that he was confident the plaintiff would have hit him "if he had been able to come down the steps." (*Id.*). Upon reviewing the video footage, defendant admitted that he could have backed away to gain some distance and, in doing so, would still have had the time to react if plaintiff did in fact "charge" at him. (*Id.*).

8

Lt. Jenkins' interview of Mr. Jones revealed that he only became involved in the incident as a means of "trying to remove" plaintiff from the situation. (*Id.*). Mr. Jones was mentoring plaintiff and did not want to see him get into trouble. (*Id.*). Based on this interview, Lt. Jenkins decided to dismiss the charge that was filed against Mr. Jones. (*Id.* at 20).

Lt. Jenkins also interviewed plaintiff. (*Id.*). Plaintiff admitted that he and another inmate had been "horse playing" and realized that was against the rules but he was initially advised by an instructor that he was recommending "an LE for his behavior." (*Id.*). He admitted that when defendant told him to pack his stuff he "cussed" at defendant and was mad at the time thinking that it was "common sense" that he could not pack up his belongings if he did not have a bag. (*Id.*). Plaintiff denied any physically aggressive behavior toward defendant and accused defendant of calling him "young minded," telling him to "grow up." (*Id.*). Mr. Jones came down the stairs and told plaintiff to "come on" and they began walking up the stairs. (*Id.*). Plaintiff did not hear defendant verbally warn him that he was about to be pepper-sprayed; rather, he began walking up the stairs away from defendant but could see out of the corner of his eye that defendant was following him and Mr. Jones up the stairs. (*Id.*). Plaintiff says defendant then reached over Mr. Jones and pepper sprayed him. (*Id.*). Although plaintiff admitted that he understood that he had not handled the situation in the best way, his actions did not warrant being pepper sprayed. (*Id.*). Plaintiff also admitted to having anger management issues and that, at certain times, he gets "black-out" mad." (*Id.*).

Ending her report, Lt. Jenkins noted that all charges pertaining to the incident against plaintiff had been dismissed and he had been returned to the RISE program. (*Id.*). On April 26, 2017, defendant had been suspended without pay pending an additional internal affairs

investigation.[4] (*Id.*). Ultimately, Lt. Jenkins' recommended that plaintiff's allegation of excessive and unnecessary force be deemed "founded" given that it was "clear" that plaintiff was moving away from defendant when the defendant pulled out his pepper spray, "closed the distance and deployed it without proper justification." (*Id.*).[5]

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that judgment as a matter of law is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet that burden, the moving party must demonstrate that no genuine issues of material fact exist. *Id.* at 322. If the moving party meets its burden, then the burden shifts to the nonmoving party to show those facts that do create disputed factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court should consider the evidence in the light most favorable to the non-moving

---

[4] Defendant's opposition clarifies that he was suspended, and ultimately terminated, in response to a situation unrelated to the issue here. (Docket no. 53 at 13–14).

[5] The court recognizes the importance of this internal affairs investigation to the parties' arguments; as noted, both plaintiff and defendant heavily rely on the memorandum as support for their respective arguments. Specifically, plaintiff places considerable weight on the report to demonstrate that his excessive force grievance was "founded" thereby emphasizing that this court's finding should mirror that conclusion. Furthermore, plaintiff stresses that the internal incident reports pertaining to this incident were "dismissed" to show that they contained "false allegations." (*See* Docket no. 51 at 4). But it is worth noting that the dismissal of the charges against plaintiff does not corollate to a finding that defendant used excessive force. Moreover, while the internal investigations report weighs in favor of plaintiff given Lt. Jenkins' findings, at this motion for summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and all reasonable inferences are drawn in his favor. Accordingly, the court has limited its use of the memorandum to the interviews of those involved; namely, plaintiff, defendant, Mr. Silva, and Mr. Jones.

party and draw all reasonable inferences in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the non-moving party's] case.").

A fact is considered "material" if it could "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is considered "genuine" if there is sufficient evidence in favor of the non-moving party which would allow the trier of fact to return a verdict for that party. *Id.* at 248–49. Summary judgment, therefore, is only appropriate where no material facts are genuinely disputed and the evidence, taken as a whole, could not lead a rational fact finder to find in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. ANALYSIS

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const., amend. VIII. In the prison context, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). "An inmate's Eighth Amendment excessive force claim involves both an objective and a subjective component." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). The first component—the objective—inquires as to whether the force applied was sufficiently serious to establish a cause of action. *Id.* This is not a high bar to meet; rather, it requires only something more than "*de minimis*" force. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)). In contrast, the subjective component exacts a more demanding standard. *Id.* The prisoner must meet a heavy burden to satisfy this component—"the state of mind required is wantonness in the infliction of

11

pain" which "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 12–13 (quoting *Whitley v. Albers*, 475 U.S. 313, 320–22 (1986), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010)).

### A. Objective Component

"An injury is sufficiently serious for purposes of the objective component of an Eighth Amendment excessive force claim as long as it rises above the level of *de minimus* harm." *Iko*, 535 F. 3d at 238 (citing *Hudson*, 503 U.S. at 9–10). The focus is not on the severity of the injuries inflicted, but rather on "'the nature of the force,' which must be 'nontrivial.'" *Tedder v. Johnson*, 527 F. App'x 269, 272 (4th Cir. 2013) (quoting *Wilkins*, 559 U.S. at 39). A prison official may violate the Eighth Amendment when he "use[s] mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko*, 535 F.3d at 240 (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)). However, the use of pepper spray does not amount to "per se . . . cruel and unusual punishment." *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978).

Plaintiff asserts that he suffered injuries as a result from the pepper spray. (*See* Docket no. 51 at 4). Immediately following the incident, he was taken to medical for "treatment of the pepper spray in [his] eyes." (*Id*). Plaintiff also includes in the exhibits to his motion for summary judgment "offender request" forms from August and October 2019 where he requested treatment for worsening eye sight due to the "chemical agents" in the pepper spray, anxiety due to the incident, and trouble sleeping because of the anxiety. (*Id.* at 4, 38, 40, 41). By contrast, defendant contends that both he and plaintiff visited medical following the incident, no injuries were noted, and no photographs taken. (Docket no. 53 at 1). Despite acknowledging the copies

of plaintiff's request for medical treatment forms, defendant asserts that plaintiff has failed to produce any evidence pertaining to treatment by a nurse for his anxiety and trouble sleeping. (*Id.* at 3).

Plaintiff has met the objective component of his excessive force claim. Defendant's argument focuses on the extent of plaintiff's injuries, or rather what he contends as a lack of injuries. But the extent of plaintiff's injuries is not dispositive here. Defendant does not deny pepper-spraying plaintiff. Defendant clearly engaged in more than *de minimis* force when he pepper-sprayed plaintiff in the face.

### B. Subjective Component

The subjective component of the analysis is far more demanding, and plaintiff bears a heavy burden. *Brooks*, 924 F.3d at 112. The key question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21. In *Whitley*, the Court outlined factors to consider when determining whether a prison official acted wantonly or maliciously: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Id.* at 321. The application of these factors is intended "to [help] determine whether punitive intent behind a defendant's use of force may be inferred because the force is not reasonably related to a legitimate nonpunitive governmental objective or could not plausibly have been thought necessary by the officers." *Shiheed v. Harding*, 802 F. App'x 765, 768 (4th Cir. 2020) (quoting *Brooks*, 924 F.3d at 116).

13

This case is a close call. But, as the non-moving party, defendant is entitled to have all the evidence considered in a light most favorable to him and all reasonable inferences drawn in his favor. And, upon an analysis of the evidence in the record, a reasonable factfinder could find in defendant's favor that he did not use excessive force when he pepper-sprayed plaintiff. Applying the *Whitley* factors, what is most at issue here is whether defendant reasonably perceived a threat to his safety that required the use of force. A reasonable factfinder could resolve the different descriptions of the events that transpired between plaintiff and defendant and credit defendant's proffered version. In the interests of fairness, and to highlight the narrowness of the factual dispute that remains at issue here, the court will proceed with an analysis of each of the *Whitley* factors.

### (i) *"The Need for the Application of Force"*

Plaintiff's main contention is that he should not have been pepper-sprayed at all. (Docket no. 51 at 20). Although he admitted to not handling the situation in the best way, he asserts that his actions did not warrant defendant's actions. (*Id.*). Defendant, by contrast, contends that he used pepper spray to "subdue" plaintiff. (Docket no. 53 at 1). He felt plaintiff was "combative" and turned "as if he [was] coming down for me," at which point he felt threatened. (*Id.*).

Despite viewing the facts in the light most favorable to defendant, the evidence in the record suggests that there was no need for the application of force at the time defendant applied it. The internal investigation, as detailed extensively above, found that plaintiff was walking away from defendant when the defendant pulled out his pepper spray, closed the distance, and deployed the spray. (Docket no. 51 at 20). Inmate Autry, when interviewed, also noted that plaintiff was walking away from defendant. (*Id.* at 19). And another officer, Sgt. Walker, attested that defendant could have gained distance and walked away from plaintiff, although

14

defendant disagrees with this assessment. (*Id.*). When defendant applied the pepper spray, it appears that plaintiff had complied with defendant's directives by walking away from defendant and up the stairs to begin gathering his belongings. The facts, therefore, concerning this first *Whitley* factor favor plaintiff.

> (ii) *"The Relationship Between the Need and the Amount of Force that was Used"*

Because the facts favor a conclusion that no force was actually necessary at the time, the second *Whitley* factor also favors plaintiff.

> (iii) *"The Extent of any Reasonably Perceived Threat that the Application of Force was Intended to Quell"*

It is this factor that proves critical to the court's denial of plaintiff's summary judgment motion. Analysis of this factor requires the court to consider the extent of any threat to the safety of staff as reasonably perceived by the prison official at the time of the incident. *See Whitley*, 475 U.S. at 321 ("But equally relevant are such factors as to the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them.").

Defendant asserts that he asked plaintiff at least three times to come down the stairs and collect the trash bag for his belongings. (*See* Docket no. 53 at 1). To that end, on the third time of asking, defendant contends that plaintiff came down the stairs "ready to fight." (*Id.*). Plaintiff "grabbed" the bag and "words [were] exchange[d]" as plaintiff proceeded back up the stairs. (*Id.*). At this point, defendant noted the involvement of inmate Jones whom he recognized as attempting to defuse the situation. (*Id.*). Defendant alleges that plaintiff looked to be "staggering" up the stairs with Mr. Jones, so he warned plaintiff that if he did not calm down, he would use his pepper spray. (*Id.*). Defendant then contends that plaintiff became "very combative" and "turned around as if he [was] coming down for me." (*Id.*). Defendant claims he

15

felt threatened, removed his pepper-spray, and proceeded up the stairs before plaintiff "had a chance to come down the stairs." (*Id.*).

Defendant explained to Lt. Jenkins that he was unable to call for assistance because his radio was charging in the building unit manager's office and he could not have reached through the door to retrieve the radio. (Docket no. 51 at 18). Defendant also noted he felt like he needed to take immediate action. (*Id.*). He stated that plaintiff was making several verbal threats suggesting he was preparing to fight defendant. (*See id.*). And again, noting inmate Jones' involvement, defendant stated that inmate Jones was trying to "pull" plaintiff up the stairs in order to diffuse the situation. (*Id.*). Moreover, defendant respectively disagreed with Sgt. Walker, who later advised him that he could have walked away from plaintiff to gain some distance, noting that he was the only Deputy in the building at the time and without his radio. (*Id.*).

Witnesses of the incident attest to plaintiff's behavior. For example, inmates Silva and Jones stated to Investigator DeLuca that plaintiff had been "mouthing off" at defendant hence inmate Jones' involvement to attempt to calm the situation. (*Id.*). Inmate Jones noted to Lt. Jenkins that he had been "trying to remove" plaintiff from the situation as he had been mentoring him and did not want to see him get into trouble. (*Id.* at 19). And plaintiff himself admitted that he had "cussed" at defendant and was "mad" at the time this incident was unfolding. (*Id.* at 20). Furthermore, as far as defendant was concerned, plaintiff was being removed from the tier as a result of fighting with another inmate, not horse-playing. (*See* Docket no. 53 at 1). Given these statements by defendant, a reasonable trier of fact could find that the defendant's version supports a finding that he did perceive a threat to his safety at the time he approached the plaintiff and discharged his pepper spray.

16

As noted above, since this matter is before the court solely on plaintiff's motion for summary judgment, the evidence must be viewed in the light most favorable to the defendant and all inferences drawn in the defendant's favor. As such, it is important to note that there are many facts in the record from which a reasonable trier of fact could conclude that plaintiff posed no physical threat to the defendant at the time. For example, plaintiff, in his interview with Lt. Jenkins, denied engaging in physically aggressive behavior. (*Id.*). And, in his motion for summary judgment, plaintiff contends that it is his belief that he was pepper-sprayed in retaliation for other inmates' behavior toward defendant; namely, their mocking of his heavy African accent. (Docket no. 51 at 4). The parties agree that plaintiff had complied with the defendant's instructions and started to proceed up the stairs away from the defendant when the defendant advanced toward the plaintiff and discharged the pepper spray. But, without the benefit of hindsight and viewing the extent of the threat as reasonably perceived by defendant at the time of the incident, the court cannot faithfully find that this *Whitley* factor does not favor defendant in some respects.

### (iv) "Any Efforts Made to Temper the Severity of a Forceful Response"

Plaintiff's contention, as noted above, is that he should not have been pepper-sprayed at all. (Docket no. 51 at 20). Implicitly, defendant notes that he delivered "a single one second burst of spray to [plaintiff's] chin." (Docket no, 53 at 1). Given the analysis as to the first two *Whitley* factors, this factor proves of no significant value to defendant. Plaintiff appears to have been complying with defendant's directive, even if aggressively so, thus a reasonable fact-finder could find that a forceful response was not necessitated.

As explained above, this case is a close call. However, the subjective component of an excessive force claim is highly demanding with plaintiff bearing a heavy burden. *See Whitley*,

475 U.S. at 321; *Brooks*, 924 F.3d at 112.  Plaintiff must show that defendant had the requisite state of mind—that is "wantonness in the infliction of pain"—and that the force applied was done so maliciously and sadistically for the purpose of causing harm.  *Brooks*, 924 F.3d at 112. The court cannot, in good faith, find that plaintiff has met that burden here: there are several material facts still in genuine dispute which preclude a ruling in favor of plaintiff's motion for summary judgment.

## IV.  CONCLUSION

For the reasons stated above, the court will deny plaintiff's motion for summary judgment.  (Docket no. 51).  Given this ruling on plaintiff's motion for summary judgment, the parties are to inform the court by September 21, 2020, if they will consent to have the undersigned conduct an evidentiary hearing and make a final ruling on plaintiff's claims after hearing the testimony of the plaintiff and the defendant.

Entered this 31st day of August, 2020.

/s/

John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia